19-mj-7304-JCB

## AFFIDAVIT OF CHRISTOPHER J. MULLEN

I, Christopher J. Mullen, being duly sworn, state under oath as follows:

## INTRODUCTION

1.     I have been employed as a Postal Inspector with the United States Postal Inspection Service ("USPIS") since August 2017.  I have been assigned to the Prohibited Mail Narcotics Unit of the USPIS's Boston Division since August 2017.  Prior to becoming a Postal Inspector, I had been employed as a Special Agent with the United States Secret Service ("Secret Service") beginning in 2009.  From 2010 through 2017, I was assigned to the Secret Service's Boston Field Office, where I investigated financial crimes and other violations of federal law. Prior to becoming a Special Agent, I was an Officer with the Secret Service's Uniformed Division, beginning in June 2005.

2.     I have received both general training in conducting criminal investigations as well as specialized training concerning the investigation of offenses involving the distribution of controlled substances.  I attended a three-month Criminal Investigator Training Course at the Federal Law Enforcement Training Center in Glynco, Georgia, and a four-month training course at the Secret Service's James J. Rowley Training Center in Beltsville, Maryland.  I have received training by the USPIS in the investigation of controlled substances and proceeds from the sales of (and/or payments for) controlled substances being transported through the United States mails. I have a Bachelor of Arts in Philosophy from Boston College and a Masters of Business Administration from The George Washington University.

3.     During my law enforcement career, I have received specialized training regarding the activities of drug traffickers, including the methods used to package, store, and distribute

drugs, and the methods used by drug traffickers to conceal and launder the proceeds of their drug

trafficking activities.  In addition to my training, I have gained extensive experience in the

investigation of the activities of drug traffickers.  Over the course of my assignment with the

USPIS and my career with Secret Service, I have participated in numerous controlled substances

investigations as a case agent and in a supporting role.  I have participated in numerous drug-

trafficking investigations involving the transportation of controlled substances or proceeds from

the sales of (or payments for) controlled substances through the United States Postal Service

("USPS"), money laundering, and related crimes.  Many of these investigations have had

national or international connections, and many required me to work closely and share

information and intelligence with members of other law enforcement agencies, including the

Federal Bureau of Investigation ("FBI"), the Drug Enforcement Agency ("DEA"), the

Massachusetts State Police ("MSP"), and the police departments of local communities.

4.      I personally have participated in various aspects of drug trafficking investigations,

including conducting surveillance, using confidential informants, acting in an undercover

capacity, and executing search warrants.  I have debriefed, and continue to debrief, suspects,

informants, and witnesses who have personal knowledge about the sale and distribution of

narcotics, money laundering, and related crimes occurring in Massachusetts and nationally.

5.      I am submitting this affidavit in support of an application for a criminal complaint

charging that, beginning on a date unknown but not later than in or about November 2018, and

continuing through on or about August 26, 2019, in Boston and Somerville in the District of

Massachusetts, and elsewhere, Aaron SMITH ("SMITH") conspired with persons known and

unknown to knowingly and intentionally distribute and possess with intent to distribute 500

grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(viii).

6.      I have personally participated in the investigation discussed in this affidavit since February 13, 2019, and I am familiar with the facts discussed below.  I am also familiar with the facts and circumstances of this investigation from oral and written reports by me and other Postal Inspectors with the USPIS, agents and/or task force officers with the Drug Enforcement Administration ("DEA"), officers from the Boston Police Department, and members of the Massachusetts State Police ("MSP"), who have assisted in this investigation.  I have also reviewed various business and financial records from various entities, including the USPS, PayPal, Comcast, Verizon, and Sprint.  This affidavit does not contain each and every fact I know about this investigation.  This affidavit only sets forth sufficient facts to demonstrate probable cause for a search warrant.

## INVESTIGATION BACKGROUND AND OVERVIEW

7.      Since February 13, 2019, I have been involved in an ongoing criminal investigation into the activities of several individuals, both known and unknown, including, among others, Aaron SMITH ("SMITH") for drug trafficking and money laundering activities. More specifically, as will be discussed below, the investigation initially focused on parcels suspected to contain methamphetamine that were being shipped from Arizona and California and being received by two individuals, Individual-1 and Individual-2.[1]  As will be discussed below, Individual-1 and Individual-2, both of whom are now cooperating with the investigation, have

---

[1] As will be discussed below, Individual-1 and Individual-2 are in a romantic relationship and live together.  I am aware of both of their names, but am not disclosing it at this time in order to protect both Individual-1 and Individual-2 from retaliation by SMITH or others acting in concert with SMITH.

confirmed that they were receiving numerous parcels of methamphetamine from Arizona, as

well as at least one parcel of methamphetamine from California.  Individual-1 and Individual-2

identified SMITH as a partner of their methamphetamine distribution business in the Boston

area.  According to Individual-1 and Individual-2, SMITH, after receiving the drugs, then

distributed the methamphetamine to other individuals in the Greater Boston Area.

### Individual-1 and Individual-2 Received Numerous Suspicious Parcels from Phoenix Arizona, Which They Admitted Contained Methamphetamine

8.      As part of an ongoing investigation concerning the illegal distribution of

methamphetamine through the mail, I reviewed USPS records and identified more than 20

suspicious parcels that were mailed via either Priority Mail or Priority Mail Express from the

Phoenix, Arizona area to Individual-1 or Individual-2 at two different addresses in

Massachusetts.  To the extent that sender information was available for these suspicious parcels,

I determined that the sender information (*i.e.*, the sender name and/or the sender address) listed

on the parcels was typically fictitious.  Based upon my training and experience, I know that

individuals engaged in illegal distribution of controlled substances through the mail typically list

fictitious sender information on the parcels in an attempt to evade law enforcement detection

should the parcel be intercepted and opened.

9.      I obtained security camera footage from the various post offices in Phoenix,

Arizona where many of the suspicious parcels were mailed.  From that security camera footage, I

determined that the same individual ("the Arizona Methamphetamine Supplier") was the sender

of at least 17 of the suspicious parcels.

10.     Between late November 2018 and mid-February 2019, four (4) of the suspicious

Priority or Priority Mail Express parcels were sent from Phoenix, Arizona to Individual-1 at a

residential address ("Address-1") in Boston, Massachusetts.  Between late-February 2019 and

July 2019, 17 of the suspicious Priority or Priority Mail Express parcels were sent from Phoenix, Arizona to Individual-2 at a residential address ("Address-2") in Somerville, Massachusetts. USPS records indicate that Individual-1 and Individual-2 completed a change of address with the USPS on February 23, 2019, officially changing their address from Address-1 in Boston, Massachusetts to Address-2 in Somerville, Massachusetts.

11.     I also obtained evidence establishing the flow of money back from Individual-1 and Individual-2 in Massachusetts to the Arizona Methamphetamine Supplier.  Western Union records establish that Individual-2 sent five payments ranging from $500 to $2,650 to the Arizona Methamphetamine Supplier between December 13, 2018 and February 3, 2019.  From USPS records, I identified five Priority Mail Express parcels that, between January 22, 2019 and May 15, 2019, were sent from Massachusetts to Phoenix, Arizona that I believed contained payment for drugs.  Four of the parcels listed sender information that I believe was associated with Individual-1 and/or Individual-2 and were addressed to the Arizona Methamphetamine Supplier at 4762 E. Portland Street, Phoenix, Arizona 85008.[2]  I was not able to locate a label for the fifth parcel.

12.     In April 2019, I obtained and executed a federal search warrant for one of the suspicious parcels sent from Phoenix, Arizona addressed to Individual-2 at Address-2 in Somerville, Massachusetts.  The parcel contained two Ziploc-style bags, one wrapped in a small blanket and the other secreted inside a stuffed bunny rabbit.  The bags contained a combined total of approximately 936 grams of crystal-like substance that was field-tested with presumptive

---

[2]  On August 7, 2019, investigators executed a search warrant at this address, which was the residence of the Arizona Methamphetamine Supplier.  Among other things, investigators seized over 450 grams of suspected methamphetamine, two scales, and approximately $1,300 in U.S. currency.  The Arizona Methamphetamine Supplier was arrested at the residence on an outstanding state warrant.

positive results for methamphetamine.  Hereinafter, I will refer to this seized parcel as "the April 2019 Seized Methamphetamine Parcel."

13.     Through a review of USPS business records and business records from Verizon, I determined that, on various occasions between April 13 and 16, 2019, a device with IP addresses assigned to Verizon was used to access the USPS Track and Confirm website and monitor the delivery status of the April 2019 Seized Methamphetamine Parcel.  Verizon business records further establish that these IP addresses were assigned to telephone number (857) 321-0880, which is subscribed to SMITH with a mailing address listed as 5 Cooper Street, Apartment 1, Boston, Massachusetts.  (Hereinafter, I will refer to (857) 321-0880 as "the SMITH Telephone" and I will refer to 5 Cooper Street, Apartment 1, Boston, Massachusetts as "the SMITH Residence.")

14.     Similarly, through a review of USPS business records and Comcast business records, I determined that on various occasions between April 13 and 16, 2019, a device with IP addresses assigned to Comcast was used to access the USPS Track and Confirm website and monitor the delivery status of the April 2019 Seized Methamphetamine Parcel.  Comcast business records further establish that these IP addresses were assigned to SMITH's account at the SMITH Residence.[3]

15.     On July 23, 2019, law enforcement officers executed a state search warrant at Address-2 in Somerville, Massachusetts.  During the execution of the search warrant, officers seized a small amount of suspected methamphetamine and $5,300 in U.S. currency.  Law

---

[3] Through my review of USPS and Comcast business records I have also determined that IP addresses assigned to SMITH's account at the SMITH Residence also accessed the USPS Track and Confirm website to monitor the delivery status of other parcels sent by the Arizona Methamphetamine Supplier to Individual-2.

enforcement officers also interviewed both Individual-1 and Individual-2.  Both individuals were advised of their *Miranda* rights and agreed to speak with law enforcement officers and cooperate with the investigation.  Individual-1 and Individual-2 acknowledged that they are in a romantic relationship, that they live together at Address-2 in Somerville, Massachusetts, and that they previously lived at Address-1 in Boston, Massachusetts.

16.     Both Individual-1 and Individual-2 were informed that they were targets of an ongoing federal investigation concerning the interstate distribution of methamphetamine via the mail, and both agreed to cooperate in the hopes of lessening their respective sentencing exposure. In connection with the ongoing investigation, Individual-1 was recently charged in federal court with being a felon-in-possession of a firearm.  Individual-1 has executed a written cooperation agreement with the government.  Individual-1 has previously been convicted of various state offenses, including firearms, drug distribution, and unlawful wounding.  Individual-1 has pending state charges relating to the illegal possession of ammunition and possession of Schedule 1-V [Controlled Substance].  Individual-1 has several dismissed state charges, including assault with a dangerous weapon, threatening, malicious destruction of property, carrying a dangerous weapon, and possession of a Burglarious Instrument.  Individual-1 is currently participating in a drug treatment program; however, Individual-1, in the past, was a regular user of methamphetamine and marijuana.

17.     Individual-2 has pending state charges including carrying a dangerous weapon and possession of a Class B Controlled Substance (Methamphetamine).  Individual-2 also has used methamphetamine, cocaine, and other controlled substances.

18.     To the extent possible, I have corroborated the information provided by Individual-1 and Individual-2 through various means, including through review of video

surveillance footage, the review of various business records, the review of evidence on

Individual-1's and Individual-2's cell phones, and other electronic evidence that they have

provided to me.  Acting under my supervision and direction, Individual-1 and Individual-2 have

also made recorded telephone calls and/or exchanged communications with various individuals

over encrypted communications applications, which corroborate the information that they have

provided.  To date, information provided by Individual-1 and Individual-2 has led to the arrest of

three individuals (one of which was SMITH), seizure of one firearm with three high-capacity

magazines, seizure pursuant to search warrant of more than 450 grams of suspected

methamphetamine, and three controlled buys of suspected methamphetamine resulting in a

combined seizure in excess of 1,500 grams.  Based upon this corroboration, I believe that both

Individual-1 and Individual-2 are accurate and reliable sources of information.

### Information from Individual-1 Concerning SMITH

19.     Individual-1 admitted that Individual-1 and Individual-2 were receiving parcels of

methamphetamine in the mail from the Arizona Methamphetamine Supplier and from other

individuals in California.  Individual-1 confirmed that the suspicious parcels discussed above

from Arizona contained methamphetamine.  Individual-1 further admitted that Individual-1 and

Individual-2 sent money back to the Arizona Methamphetamine Supplier and to the

methamphetamine suppliers in California for the purpose of obtaining additional

methamphetamine.  Individual-1 stated that the Arizona Methamphetamine Supplier had sent a

parcel containing methamphetamine in April 2019 that was to be delivered to Address-2 in

Somerville, Massachusetts, but was never received.

20.     Individual-1 stated that she/he met SMITH in or around November or December

2018 when SMITH came to Address-1 in Boston, Massachusetts to meet with Individual-2.

From approximately November or December 2018 through approximately March 2019,

Individual-1 reported that the majority of Individual-1's contact with SMITH was social

conversation.  Individual-1 stated that, on occasion, she/he helped Individual-2 finalize

methamphetamine-related deals with SMITH.  Individual-1 reported that beginning in

approximately March 2019 and continuing through July 23, 2019 (when investigators searched

the residence shared by Individual-1 and Individual-2), Individual-1 became the primary contact

with SMITH.

21.     Individual-1 stated that the relationship with SMITH evolved such that SMITH

became a partner in the methamphetamine distribution business with Individual-1 and

Individual-2.  Individual-1 explained that SMITH regularly contributed significant quantities of

cash toward the purchase of methamphetamine from the Arizona Methamphetamine Supplier.

Individual-1 stated that, at times, SMITH obtained his share of the drugs at the price charged by

the Arizona Methamphetamine Supplier (rather than at an increased price that Individual-1 and

Individual-2 charged customers).  Individual-1 further stated that she/he and Individual-2 had

engaged in "wholesale swaps" of methamphetamine with SMITH in which one party lent

quantities of methamphetamine to the other without payment until the borrower obtained a new

quantity of methamphetamine and could return an equal amount to the lender.

22.     Individual-1 stated that she/he or Individual-2 received the tracking number from

the Arizona Methamphetamine Supplier when parcels were shipped.  At times, Individual-1 or

Individual-2 provided the tracking numbers for these parcels to SMITH.  Individual-1 described

a methamphetamine parcel sent from Arizona that was never received in Massachusetts.

Individual-1 stated that SMITH contributed money toward the purchase of methamphetamine in

this missing parcel, and that Individual-1 or Individual-2 had provided SMITH with the tracking

number for this missing parcel.  Based upon the USPS records discussed above and

conversations with Individual-1 and Indididual-2, I have confirmed that this missing parcel

was the April 2019 Seized Methamphetamine Parcel.

    23.    Individual-1 consented to a search of Individual-1's cellphone.  Individual-1's

cellphone revealed a contact on Signal for "Aaron North End" and listed the SMITH Telephone

number for this contact.  Individual-1 stated she/he contacted SMITH using the SMITH

Telephone number and the "Aaron North End" contact on Signal.

### Information Obtained from Individual-2

    24.    Individual-2 confirmed that Individual-1 and Individual-2 had received parcels

containing methamphetamine from the Arizona Methamphetamine Supplier and that the

suspicious parcels described above contained methamphetamine.  Individual-2 further confirmed

that Individual-2 had sent money back to the Arizona Methamphetamine Supplier for the

purpose of obtaining additional methamphetamine.

    25.    Individual-2 stated that she/he met SMITH in or around November or December

2018.  Individual-2 reported that SMITH met with Individual-2 at Address-1 in Boston,

Massachusetts to discuss the purchase of methamphetamine.  Individual-2 advised that during

this initial meeting, SMITH and Individual-2 discussed the quality of the methamphetamine

received from their respective suppliers.  During this meeting, Individual-2 gave SMITH an

eighth of an ounce of methamphetamine.  Approximately one day later, SMITH gave Individual-

2 an eighth of an ounce of methamphetamine obtained from SMITH'S then-methamphetamine

supplier.

    26.    Individual-2 consented to a search of Individual-2's cellular telephone.

Individual-2's telephone revealed a contact on Signal for "Aaron North End" and listed the

SMITH Telephone number for this contact.  Individual-2 stated that she/he contacted SMITH

using the SMITH Telephone number and the "Aaron North End" contact on Signal.

27.     Individual-1 and Individual-2 each also stated that SMITH, at times, provided

payment for methamphetamine via PayPal.  Individual-1 and Individual-2 each provided me with

access to their respective PayPal accounts and identified those transactions that involved

SMITH.  These PayPal records identified SMITH as the sender of the payments and listed the

SMITH Telephone with the account.  These PayPal records reflect that SMITH sent the

following amounts of money on the dates listed below to Individual-1 or Individual-2:

a.     March 4, 2019:        $600        (Individual-1)

b.     April 8, 2019          $100        (Individual-2)

c.     April 11, 2019         $25         (Individual-2)

d.     April 29, 2019         $500        (Individual-2)

e.     April 30, 2019         $400        (Individual-2)

f.     May 2, 2019:          $400        (Individual-1)

g.     June 7, 2019:          $400        (Individual-2)

h.     June 9, 2019:          $100        (Individual-1)

i.     July 18, 2019:         $200        (Individual-1).

Individual-1 and Individual-2 stated that each of these PayPal payments reflected payments (or

partial payments) for methamphetamine by SMITH.  Based on a review of USPS business

records, I determined that on all but one of the above-listed dates, Individual-1 and Individual-2

received a parcel of methamphetamine in the mail on the day, or within a day, of when SMITH

sent money via PayPal to Individual-1 or Individual-2.

**August 2019:  SMITH Gave $2,000 to Individual-1, Who Was Cooperating with
Investigators, Intending that the Money Be Sent to Buy Methamphetamine**

28.     In August 2019, Individual-1, acting at my direction, contacted SMITH on the

SMITH Telephone and subsequently collected $1,650 in U.S. Currency from SMITH at the

SMITH Residence, which was intended by SMITH to be a down payment for the purchase of

one pound of methamphetamine.  Later the same day, SMITH transferred an additional $350 to

Individual-1 via PayPal.

**August 11 - 14, 2019:  SMITH and Individual-1 Had Recorded Conversations
Concerning the Purchase of Methamphetamine**

29.     Beginning on August 11, 2019, Individual-1 engaged in a series of consensually-

recorded calls with SMITH on the SMITH Telephone via Signal.  The purpose of these calls was

to determine whether SMITH wanted to contribute money toward the purchase of

methamphetamine from a new supplier based in California.  In these calls, Individual-1

explained the arrangement to SMITH and discussed the cost for the methamphetamine.

30.     For example, at approximately 6:26 p.m. on August 11, 2019, Individual-1, acting

at my direction, placed a consensually-recorded phone call to SMITH at the SMITH Telephone

via Signal.  I was not present at the time, but subsequently reviewed Individual-1's telephone and

took a screen shot reflecting that Individual-1 did, in fact, call the SMITH Telephone via Signal

at this time.  I have reviewed the entire recording of this conversation and have prepared a

preliminary transcript of a portion of the call.

31.     At my instruction, Individual-1 asked whether SMITH wanted to contribute

money toward a future purchase of methamphetamine:

> Individual-1:  *So, umm, the pricing's good right now. We got a 'P,' umm,
> Wednesday.  Burned through that shit, and uh 25 plus shipping
> costs, and that's it flat across the board…you know to be honest
> with you like Phoenix shit is good, but it's got like little dirty little*

*tinge to it that like everybody likes. This shit is like, it's, it's as good, it's not better, but it's as good.*

SMITH:          *Yeah.*

\* \* \*          \* \* \*

Individual-1:   *The only thing is, is like, they require everything up front, but I'm not expecting you, umm, just cause of last, you know the, the hiccup there.  If you could do like two, and then like, and then we'll cover the rest.*

SMITH:          *Yeah.*

Individual-1:   *I'm just gonna charge you cost, I'm not even trying to fuck around like, umm, so like we'll cover, you know what we can split the shipping cost, it's only like, it's only 60 bucks.*

SMITH:          *No shit, yeah.*

Individual-1:   *30 each, we're going to put one in and then if you want one, umm, take two from you.*

SMITH:          *Yeah.*

Individual-1:   *And then, uhh, are you good for that you think?*

SMITH:          *Yeah, absolutely.*

\* \* \*          \* \* \*

Individual-1:   *You know 1 to 2 at a time, but it's perfect, just like we did with B, but like efficient and like on time so.*

SMITH:          *Yeah, getting responses on the other end.*

Individual-1:   *Yeah, so we can kinda get back to where we were before the fucking…*

SMITH:          *Right.*

Individual-1:   *…the bottom fell out. Remember that lost package? Cause ever since that lost package, umm, we've never, we've never like recovered completely to like where we were, and I felt like there was still room to grow.*

SMITH:          *Yeah, yeah.*

13

32.     In this excerpt of the call, Individual-1 told SMITH that he was getting an acceptable price for methamphetamine from a new supplier (*"the pricing's good right now"*), and that she/he had received a pound of methamphetamine the previous Wednesday (*"We got a 'P,' umm, Wednesday"*).  Individual-1 stated that the shipment of methamphetamine sold quickly (*"Burned through that shit"*).  Individual-1 assured SMITH that, with this new supplier, the pricing for the methamphetamine was $2,500 per pound plus shipment and that this price would remain constant and not fluctuate (*"uh 25 plus shipping costs, and that it's flat across the board"*).  Individual-1 compared the methamphetamine he was getting from California to the previous product that they had received from Arizona and told SMITH that this methamphetamine was as good as the methamphetamine that they had been previously purchasing from Arizona (*"Phoenix shit is good, but it's got like little dirty little tinge to it that like everybody likes. This shit is like, it's, it's as good, it's not better, but it's as good."*).  Individual-1 explained that that the arrangement was going to be similar to the arrangement that they had with the Arizona Methamphetamine Supplier (whose first name begins with a "B")– namely, one to two pounds of methamphetamine per shipment, but that this supplier was more reliable (*"You know 1 to 2 at a time, but it's perfect, just like we did with B, but like efficient and like on time so"*).  Individual-1 expressed optimism that Individual-1 and SMITH would be able to successfully grow their distribution business in a manner similar to the way that they were operating before the April 2019 Seized Methamphetamine went missing (*"Remember that lost package? Cause ever since that lost package, umm, we've never, we've never like recovered completely to like where we were, and I felt like there was still room to grow."*).  SMITH agreed.

33.     Individual-1 then explained that California-based methamphetamine supplier required payment in advance of the shipment (*"The only thing is, is like, they require everything*

*up front"*).  Individual-1 informed SMITH that she/he was not expecting SMITH to prepay in

full after the bad experience when they never received the April 2019 Seized Methamphetamine

Parcel, but instead suggested that SMITH contribute $2,000 with Individual-1 and Individual-2

paying the remainder of the cost of the drugs (*"but I'm not expecting you, umm, just cause of*

*last, you know the, the hiccup there.  If you could do like two, and then like, and then we'll cover*

*the rest."*).  Individual-1 informed SMITH that he was going to let SMITH have the

methamphetamine at Individual-1's purchase price and that the two would split the cost of

shipping the methamphetamine from California (*"I'm just gonna charge you cost, I'm not even*

*trying to fuck around like, umm, so like we'll cover, you know what we can split the shipping*

*cost, it's only like, it's only 60 bucks."*).  Individual-1 stated that she/he was planning on ordering

a pound of methamphetamine (*"we're going to put one in"*) and offered to order a second pound

for SMITH for which SMITH would only need to pay $2,000 in advance (*"if you want one,*

*umm, take two from you"*).  Individual-1 asked SMITH if he liked this arrangement (*"are you*

*good for that you think?"*) and SMITH replied affirmatively (*"Yeah, absolutely."*).

34.     At approximately 5:50 p.m. on August 14, 2019, Individual-1, acting at my

direction, placed a consensually-recorded phone call to SMITH at the SMITH Telephone via

Signal.  I was not present at the time, but subsequently reviewed Individual-1's telephone and

took a screen shot reflecting that Individual-1 did, in fact, call the SMITH Telephone via Signal

at this time.  I have reviewed the entire recording of this conversation and have prepared a

preliminary transcript of a portion of the call.

35.     At my instruction, among other things, Individual-1 provided SMITH with an

update on the planned purchase of methamphetamine:

> Individual-1:   *Everything's a go, umm, I talked to them, they're ready to ship off*
> *tomorrow, actually, for Friday delivery.  Umm, I will come by,*

> *uhh, is like tomorrow morning a good time to come by?  I can just swing by, pick it up, and then just go straight to the post office."*

SMITH:       *Yeah, that works.*

Individual-1:  *Alright cool. So uhh, do you think you'll be up and around like between like 11 and 12?*

SMITH:       *I'll make sure I am.*

36.     In this portion of the call, Individual-1 informed SMITH that he had spoken with the California methamphetamine supplier and reported to SMITH that a parcel was going to be shipped the next day (Thursday) for a Friday delivery (*"Everything's a go, umm, I talked to them, they're ready to ship off tomorrow, actually, for Friday delivery."*).  Individual-1 suggested that he would stop by SMITH's Residence the next day and pick up the cash from SMITH for the drugs on Individual-1's way to the post office to mail the money to the California methamphetamine supplier (*"is like tomorrow morning a good time to come by?  I can just swing by, pick it up, and then just go straight to the post office"*).  SMITH agreed to this suggestion (*"Yeah, that works."*), and told Individual-1 that he would be ready when Individual-1 arrived (*"I'll make sure I am."*).

### August 15, 2019:  SMITH Met with Individual-1 at the SMITH Residence and Gave Individual-1 $1,650 for the Purchase of Methamphetamine

37.     At approximately 11:15 a.m. on August 15, 2019, other investigators and I met with Individual-1.  I searched Individual-1 for controlled substances, contraband, and U.S. currency and determined that he was not in possession of any of these items.  Investigators then placed an audio- and video-recorder on Individual-1's person.  The recording device also permitted investigators to monitor any conversations by Individual-1 on a real-time basis.

38.     Thereafter, investigators maintained constant surveillance on Individual-1 as he traveled directly to the building where the SMITH Residence is located.  Individual-1 knocked

on the front door of the SMITH Residence and determined that SMITH was not home.  Using

Signal, Individual-1 then texted SMITH on the SMITH Telephone to inform SMITH that

Individual-1 was at the SMITH Residence.  SMITH replied, *"5 mins away."*  (Investigators were

not present during these text message communications, but subsequently reviewed the text

messages and took screen shots of the messages.)

39.     A short time later (at approximately 12:01 p.m.), surveillance officers observed

SMITH arrive via a red minivan that appeared to be part of a rideshare service.  SMITH exited

the minivan carrying what appeared to be a black backpack.  Surveillance officers observed

SMITH greet Individual-1, who was waiting for SMITH on the front steps of the SMITH

Residence.  SMITH opened the door to the SMITH Residence and Individual-1 followed him

into the SMITH Residence.

40.     Approximately fifteen minutes later, surveillance officers observed Individual-1

exit the SMITH Residence and walk back to a predetermined meeting location.  From the

moment Individual-1 left the SMITH Residence, Individual-1 was under constant surveillance.

At the predetermined meeting location, Individual-1 met with investigators and showed them

that he had received $1,650 in U.S. currency.  Investigators searched Individual-1 and

determined that he was not in possession of any additional currency or controlled substances.

Individual-1 reported that he received this cash from SMITH for the purpose of purchasing

methamphetamine.

41.     Individual-1 stated that SMITH removed the $1,650 in U.S. Currency from a

backpack that SMITH normally carries with him and gave the cash to Individual-1.  Individual-1

stated that during the meeting at the SMITH Residence, SMITH showed Individual-1 a text

message and photograph on SMITH's telephone that SMITH said was from a methamphetamine

customer complaining about drugs that SMITH sold.  Individual-1 reported that SMITH

informed Individual-1 that SMITH would forward the remainder of the $2,000 payment via

PayPal.  Individual-1 also said that she/he saw crumbs and residue of a crystal-like substance on

the coffee table that Individual-1 believed to be methamphetamine.

42.     Investigators also took possession of the audio- and video-recording device that

had been given to Individual-1.  I have reviewed both the audio and video from this meeting.

The video shows SMITH approaching the SMITH Residence from the street on Cooper Street,

and greeting Individual-1 on the front steps of the SMITH Residence. The video goes on to show

SMITH opening the door to the SMITH Residence.  During the remainder of the meeting inside

the SMITH Residence, however, the video only shows an interior wall of the SMITH Residence

due to the angle of the camera.

43.     The meeting between SMITH and Invididual-1 was successfully audio-recorded.

I have reviewed the entire recording of this conversation and have prepared a preliminary

transcript of a portion of the meeting.  Among other things, the following conversation took

place between Individual-1 and SMITH inside the SMITH Residence:

> SMITH:          *So I have 1650 on me right now, umm, homegirl's coming back*
> *with 300.*
>
> Individual-1:   *It's all good, I mean uh, we can always just piece it together later*
> *too.*
>
> SMITH:          *I picked up a QP last night.*

44.     In this portion of the recorded conversation, SMITH informed Individual-1 that he

only had $1,650 in cash available at the moment, but that he was expecting an additional $300 to

be delivered shortly (*"So I have 1650 on me right now, umm, homegirl's coming back with*

*300."*).  Individual-1 assured SMITH that this was acceptable and that SMITH could give him

the missing amount at a later time (*"It's all good, I mean uh, we can always just piece it together later too."*).[4]  SMITH informed Individual-1 that he had obtained a quarter-pound of methamphetamine from another source the previous evening (*"I picked up a QP last night"*).

45.     In the recorded conversation, SMITH also discussed the fact that he had a new source for methamphetamine based in Kansas City:

SMITH:          *The shit, the shit, I've been getting recently is fire.*

Individual-1:   *KC?*

SMITH:          *Yeah.*

Individual-1:   *Yeah, no, that's what [Individual-2] said, [Individual-2] said this shit is like woah.*

SMITH:          *Yeah, it's dope but it's fire.*

Individual-1:   *It's fuckin five grand.*

SMITH:          *That's the thing because I'm getting it on the cuff right now, and hopefully once I get ahead of it. It be like four, you know something a little more reasonable.*

Individual-1:   *Yeah, I mean like--*

SMITH:          *Cause, he, he's cool and, he, he's like willing to work with me and he likes, he's like, I can get it by the week.*

Individual-1:   *We'll jump in on that too.*

SMITH:          *And it's like, but dude, I can't, I can't be doing five a pound.*

Individual-1:   *Yeah, no, no*

SMITH:          *I appreciate it on the cuff, and it's workable kind of, but it's like, "if I'm getting something for half price are you really going to tell me yours is twice as, like twice as good?"*

---

[4] Later in the recorded conversation, consistent with Individual-1's report to investigators, Individual-1 agreed that SMITH could pay the remainder via PayPal.

46.     In this excerpt of the recording, SMITH discussed methamphetamine that SMITH had recently obtained (*"The shit, the shit, I've been getting recently is fire"*).  SMITH confirmed that the supplier was in Kansas City (*"KC"*).  SMITH stated that the methamphetamine was high quality (*"it's dope but it's fire"*).  SMITH explained that the Kansas City methamphetamine supplier was providing the methamphetamine to SMITH prior to receiving payment from SMITH for the drugs ("*I'm getting it on the cuff right now"*).  SMITH stated that he was paying $5,000 for one pound of methamphetamine *("five a pound")*, but that he hoped the price would go down to $4,000 per pound once he could pay for the drugs in advance (*"hopefully once I get ahead of it. It be like four, you know something a little more reasonable"*).  SMITH expressed appreciation that he did not have to pay for the methamphetamine in advance, but expressed his belief that he did not think that the drugs from the Kansas City Methamphetamine Supplier was worth paying twice the price he was paying Individual-1 for a pound of methamphetamine (*"I appreciate it on the cuff, and it's workable kind of, but it's like, 'if I'm getting something for half price are you really going to tell me yours is twice as, like twice as good?'"*).

47.     Later that day, Individual-1 contacted me and advised me that SMITH had sent Individual-1 $350 via PayPal.  I subsequently reviewed PayPal records from Individual-1's PayPal account establishing that, at approximately 5:58 p.m. on August 15, 2019, SMITH sent Individual-1 $350 via PayPal transaction ending 1159.

**August 16 - 21, 2019:  SMITH Contacted Individual-1 via Signal to Check on the Status of the Incoming Methamphetamine Parcel**

48.     Over the next several days, SMITH used the SMITH Telephone on Signal to send text messages asking about the incoming methamphetamine parcel.  (Investigators were not present when these messages were received, but subsequently reviewed the text messages and took screen shots of the messages.)

49.     For example, at approximately 5:33 p.m. on August 16, 2019, SMITH used the SMITH Telephone on Signal to send a text message to Individual-1.  SMITH requesting an update as to whether the methamphetamine package had arrived (*"Can I get a response, whether good, bad, or indifferent it would be greatly appreciated to have you let me know what's up. I'm not asking for the tracking and to know every detail. I did think it was arriving today and had started planning. What's the word?"*).  Individual-1 informed SMITH that the package was delayed in being sent.  SMITH replied, *"Fuck. I am bone dry."*

50.     On August 21, 2019, SMITH used the SMITH Telephone on Signal to send a series of communications to Individual-1 and Individual-2 via a group text message.  First, at approximately 1:37 p.m., SMITH asked if Individual-1 or Individual-2 had requested a tracking number from their supplier of methamphetamine (*"I can only imagine you've asked about a tracking number. What response did you get? I mean are you getting any response??"*).  Approximately one hour later, SMITH sent a follow-up message asking Individual-1 or Individual-2 when they thought the methamphetamine parcel might arrive (*"So what's your feeling? If you had yo guess on a day for it to arrive"*).  Approximately three hours later, SMITH sent another follow-up message asking if Individual-1 and Individual-2 thought that they had been ripped off by the methamphetamine supplier (*"So seriously, you've heard nothing all day? We got hosed if that's the case"*).  Individual-2 responded by speculating that the methamphetamine parcel might arrive on August 22, 2019, and that a tracking number would be provided shortly (*"If I had to guess I would say Thursday. We've talked to them but don't have tracking. Letting them work things out on their end. We didn't get hosed. We've talked to them and they said they would produce a tracking number today. We are hounding them and stepping it up also"*).  SMITH replied, *"Thank you."*

**August 26, 2019:  SMITH Received Approximately 440 Grams of Methamphetamine from Individual-1 and Was Arrested on State Charges**

51.     At approximately 10:15 a.m. on August 26, 2019, other investigators and I met with Individual-1.  I searched Individual-1 for controlled substances, contraband, and U.S. currency and determined that he was not in possession of any of these items.  Individual-1 was equipped with a device capable of audio-recording and real-time monitoring.

52.     Beginning at approximately 10:19 a.m., Individual-1 and SMITH used Signal to exchange a series of text messages.  Individual-1 informed SMITH that the package of methamphetamine had arrived and that it was of good quality (*"Delivered! Thank fucking God!!! Looks fire AF"*).  SMITH replied, *"Fuck yes."*  Individual-1 informed SMITH that she/he was verifying the weight of the methamphetamine and would then meet with SMITH before meeting with customers (*"Weighing then heading out to you first."*).  Individual-1 also told SMITH that she/he already had buyers for the whole pound of methamphetamine that Individual-1 had received (*"Our P is pretty much sold already. Crazzzzy."*).  SMITH replied that he also had prospective buyers for the pound of methamphetamine that Individual-1 was bringing to him, and expressed his desire to place another order for methamphetamine as soon as possible (*"Mine as well. Let's get another order going asap. And thank you for your patience with and this m"*).  Individual-1 agreed and asked whether SMITH preferred to place the next methamphetamine order through Individual-1's Los Angeles-based supplier of methamphetamine or through SMITH'S Kansas City-based supplier of methamphetamine (*"Indeed. No worries brutha. Wanna go through LA or KC? I'd like to discuss the KC option."*).  Individual-1 empathized with having to deal with customers while waiting for a package of methamphetamine, especially when no other methamphetamine was available (*"We understand. It's stressful as fuck waiting and getting pressed by customers. Especially when your bone dry."*).  SMITH informed Individual-1

that he was open to using either methamphetamine supplier but that he preferred utilizing Individual-1's Los Angeles-based methamphetamine supplier because that supplier offered a lower price than SMITH's Kansas City-based supplier of methamphetamine (*"Either way ... I'm open to doing KC. I do like LA cuz the numbers but i can't wait like that again"*).

53.     At approximately 10:55 a.m. on August 26, 2019, I walked with Individual-1 to a coffee shop located on Hanover Street in Boston, Massachusetts, where Individual-1 had agreed to meet with SMITH.  I arranged for Individual-1 to be seated at a table in the coffee shop, and then gave Individual-1 two vacuum-sealed bundles containing a total of approximately 440 grams of a crystal-like substance that had previously been field-tested with presumptive positive results for methamphetamine.  Individual-1 placed both bundles inside a navy blue bag that I had searched previously and determined did not contain any other controlled substances, contraband, or U.S. currency.

54.     Another investigator and I sat a few tables away from Individual-1 where we were able to maintain continuous surveillance of Individual-1 and observe the meeting between Individual-1 and SMITH.  At approximately 11:13 a.m., SMITH arrived at the coffee shop and sat down at the table with Individual-1.  SMITH and Individual-1 engaged in conversation.  I was unable to monitor the conversation between Individual-1 and SMITH due to a malfunction of the recording/monitoring device.

55.     At approximately 11:27 a.m., I observed Individual-1 open the navy blue bag containing the methamphetamine and hold it under the table so that SMITH could access the contents.  At that time, SMITH got up from the table, obtained a brown paper bag from behind the counter of the coffee shop, and returned to the table where Individual-1 was seated.  I then observed SMITH remove the two bundles of methamphetamine from Individual-1's bag and

place them in the brown paper bag that SMITH had just obtained.  After transferring the

methamphetamine to his brown paper bag, SMITH continued to engage in brief conversation

with Individual-1.  SMITH then got up from the table and departed the coffee shop carrying the

brown paper bag with methamphetamine.  Immediately upon his exit from the coffee shop,

SMITH was taken into custody by Boston Police officers.  Investigators recovered the full

quantity of methamphetamine that had been provided to Individual-1 from the brown paper bag

that Smith was carrying.

56.     A few moments after SMITH departed the coffee shop, Individual-1 left the

coffee shop.  Surveillance officers followed Individual-1 to an agreed-upon meeting location.

Individual-1 informed the officers that she/he met with SMITH at the coffee shop.  Individual-1

stated that she/he told SMITH that the methamphetamine was just wrapped in plastic and showed

him the methamphetamine in the navy blue bag.  Individual-1 said that SMITH retrieved a brown

paper bag and then transferred the methamphetamine from Individual-1 into the brown paper

bag.

57.     At approximately 11:45 a.m. on August 26, 2019, investigators executed a federal

search warrant at the SMITH Residence.  Investigators seized approximately ten grams of a

crystal-like substance in a plastic bag on the coffee table that was field-tested with presumptive

positive results for methamphetamine.  Investigators also recovered numerous, unused, plastic

Ziploc-style bags and a digital scale.  Based upon my training and experience, I believe that these

items are consistent with the distribution of controlled substances such as methamphetamine.

Investigators also seized several notebooks, some of which contained ledger-style activity that I

believe to be consistent with the distribution of controlled substances such as methamphetamine.

58.     Later that day, after being advised of his *Miranda* rights, SMITH agreed to speak

with investigators in an audio-recorded interview.  SMITH acknowledged that agents that he had

walked out of the coffee shop with the methamphetamine that had been seized by investigators.

SMITH further admitted to obtaining a paper bag from inside the coffee shop because, as

SMITH explained, "*I didn't want to walk out with just that stuff in my hands.  It's not a good*

*look*."  During the interview, SMITH acknowledged receiving methamphetamine from a Kansas

City-based supplier who was mailing methamphetamine packages to the SMITH Residence.

SMITH acknowledged that these methamphetamine parcels were addressed either to his

girlfriend or to a fictitious recipient and that SMITH had provided those names to the supplier.

SMITH stated that his girlfriend (who resided with SMITH at the SMITH Residence) was not

involved in the receipt and/or distribution of methamphetamine.

59.     I have reviewed USPS records and have identified approximately seven Priority

Express parcels that were mailed on or after May 29, 2019, from the Kansas City area to the

SMITH Residence and elsewhere that appear to be related to SMITH.  Based upon my

participation in the investigation, as well as SMITH's statements to Individual-1 and to me, I

believe that these parcels contained methamphetamine.  USPS records reflect that the most

recent parcel from Kansas City arrived in the Boston area on or about August 9, 2019.

## CONCLUSION

60.     Based upon the evidence set forth above, I submit that there is probable cause to

believe that beginning on a date unknown but not later than in or about November 2018, and

continuing through on or about August 26, 2019, in Boston and Somerville, in the District of

Massachusetts, and elsewhere, Aaron SMITH conspired with others known and unknown to

knowingly and intentionally distribute and possess with intent to distribute 500 grams or more of

a mixture or substance containing a detectable amount of methamphetamine, a Schedule II

controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(viii).

Respectfully submitted,

_____
CHRISTOPHER J. MULLEN
Postal Inspector
United States Postal Inspection Service

Subscribed to and sworn before me this
on the 9th day of September 2019.

_____
HON. JENNIFER C. BOAL
United States Magistrate Judge
District of Massachusetts

26