UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                      )<br>)<br>AARON SMITH,                               )<br>)<br>          Defendant.                    )<br>) | Case No. 20-Cr-10046-GAO |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States respectfully submits this sentencing memorandum in anticipation of sentencing, which is scheduled for February 17, 2020.  Consistent with the factors to be considered for the imposition of a sentence, including the advisory guideline sentencing range ("GSR") and the sentencing factors identified in 18 U.S.C. § 3553(a), the United States recommends that the Court sentence Aaron SMITH ("SMITH") to a term of imprisonment in the range of 36 to 42 months, a term of supervised release of three years, and a mandatory special assessment of $200.

     **I.**     **OFFENSE BACKGROUND**

SMITH was a methamphetamine addict and mid-level methamphetamine distributor operating in the Boston area.  SMITH was originally a customer of two other local methamphetamine dealers, who were being supplied methamphetamine by Brandon Greenberg ("Greenberg"), who lived in Phoenix, Arizona.  Over time, however, the relationship evolved into more of a partnership whereby SMITH was permitted to pay wholesale cost for the methamphetamine.  SMITH, however, had no dealings with Greenberg.  *See generally* PSR ¶¶ 14-18.

In April 2019, investigators seized a two-pound package of methamphetamine from Arizona that was en route to SMITH's local suppliers. SMITH had contributed cash toward the purchase of this seized methamphetamine and was supposed to receive one pound. *See generally* PSR ¶¶ 19-22. After the loss of this parcel, SMITH continued to participate in the methamphetamine conspiracy with his Massachusetts-based suppliers. PSR ¶ 23.

In July 2019, investigators searched the suppliers' apartment, which resulted in SMITH's Massachusetts-based suppliers agreeing to cooperate with law enforcement. Investigators then commenced an undercover operation utilizing the services of one of SMITH's now-cooperating suppliers (hereinafter referred to as "CW-1"). At the direction of investigators, CW-1 engaged in consensually-recorded communications with SMITH via Signal, an encrypted communications application. CW-1 informed SMITH about a new purported California-based methamphetamine supplier from whom they were going to obtain methamphetamine. CW-1 advised SMITH that they were going to order a pound of methamphetamine from this new supplier and offered to order a second pound for SMITH. Because SMITH lost money from the April 2019 seizure, CW-1 informed that SMITH only needed to pay $2,000 in advance, rather than the full purchase price. *See* PSR ¶¶ 36-37.

On August 15, 2019, CW-1 went to SMITH's apartment and collected $1,650 in cash from SMITH. During this consensually-recorded meeting, SMITH promised to send via PayPal the remainder of the money owed (which SMITH did). SMITH also discussed the fact that he too had developed a new out-of-town methamphetamine supplier. *See generally* PSR ¶¶ 39-40.

Between August 16 and 21, 2019, SMITH engaged in numerous incriminating communications with CW-1 via Signal. *See* PSR ¶ 41. On August 26, 2019, CW-1, acting under investigators' supervision, delivered a pound of methamphetamine to SMITH at a North

End coffee shop.  SMITH took the methamphetamine out of CW-1's bag and put the drugs in a brown paper bag.  Investigators arrested SMITH after he exited the coffee shop with the methamphetamine.  PSR ¶ 43.

Later that day, investigators executed a search at SMITH's residence and seized a small quantity of methamphetamine, numerous, unused plastic Ziploc-baggies, a digital scale, and drug ledgers.  PSR ¶ 44.  During a post-arrest, *Mirandized* recorded statement, SMITH made several incriminating statements and acknowledged receiving parcels of methamphetamine from an out-of-state supplier.  *See* PSR ¶ 45.

## II.     PSR AND ADVISORY SENTENCING GUIDELINES

The Probation Office determined that SMITH's total offense level is 29,[1] and that SMITH, who has no prior countable convictions, is a CHC I.  PSR ¶¶ 64-69.  As a result, SMITH's advisory guideline sentencing range (GSR) is 87-108 months.  PSR ¶ 116.  The parties agree with this calculation.

## III.    SMITH's SUCCESFUL PARTICIPATION IN THE RISE PROGRAM WARRANTS A THREE-YEAR REDUCTION IN THE ADVISORY GSR

SMITH was admitted into the RISE program and, by all accounts, was an unqualified success.  SMITH also completed all three parts of the District's Restorative Justice program (including the mandatory restorative justice workshop in April 2021, as well as the optional trauma reading group in summer 2021, individual restorative readings, and individual restorative conference in January 2022).  SMITH was invited to be, and served as, a peer leader in the November 2021 restorative justice workshop.  SMITH also participated as a peer leader in a five-

---

[1] Among other things, this calculation included a conservative estimate that SMITH should be held accountable for between 500 grams, but less than 1.5 kilograms of "ice."  *See* PSR ¶¶ 51-54.

week trauma reading group for restorative justice program participants that took place between January 14 and February 11, 2022, and he participated as a peer leader in a 16-hour virtual restorative justice workshop conducted on February 9-10, 2022.

The Probation Office's RISE report characterizes SMITH's involvement as follows: *"He is a stand-out participant and has really gone above and beyond what is required of him."* The Probation Office's Addendum to the RISE Report notes that SMITH went well beyond what was expected during the Restorative Justice programming and that SMITH has had the *"most peer leadership roles any participant has completed to date."*

In light of SMITH's extraordinary participation in the RISE program and his unique efforts in trying to improve both his own life and the lives of others, the Government recommends a 36-month reduction in SMITH's advisory GSR, thus resulting in an effective advisory GSR of 51-72 months. The Government notes that this is one of the largest reductions that the Government has recommended for a RISE graduate, and it is based solely upon SMITH's exceptional conduct while in the RISE program. SMITH has distinguished himself as among the highest achieving RISE participants in the history of the program. He has gone well beyond what was asked of him during the program and he has demonstrated initiative and commitment to his rehabilitation and the rehabilitation of others. The Government submits that SMITH should be recognized for these efforts and believes that the proposed 36-month reduction in his advisory GSR accomplishes this objective. With this 36-month recommended reduction, SMITH's revised advisory GSR is effectively 51-72 months.

### IV.   SENTENCING RECOMMENDATION

For the reasons that follow, the Government recommends that a sentence of imprisonment in the range of 36 to 42 months is warranted under the facts of this case. SMITH's

criminal conduct was serious and involved the distribution of a dangerous and highly addictive drug that has been wreaking havoc in local communities. Moreover, SMITH's conduct was neither aberrational, nor a momentary lapse in judgment. To the contrary, by the time of his arrest in August 2019, methamphetamine distribution was SMITH's livelihood and sole source of income.

At the same time, the Government submits that a sentence within the revised advisory GSR (after taking into account the recommended RISE program reduction) is unnecessary under the unique facts of this case. Among other things, the Government notes that Greenberg, the Arizona-based supplier, was sentenced in the District of Arizona to only 50 months. While the Government sought a significantly greater sentence for Greenberg, the sentencing court disagreed. Given this, the Government believes that SMITH, who played a lesser role in the conspiracy, should receive a proportionately lower sentence.

The Government also recognizes that SMITH, for a number of years, had been struggling with addiction and that his criminal conduct was, in great part, a result of that addiction. Since his arrest, SMITH has taken great strides to address the deficits in his life in a positive manner, through a combination of treatment, education, and employment. Although many of these efforts have been captured by the proposed reduction resulting from SMITH's participation in the RISE program, the Government submits that an additional reduction is warranted under the unique facts of this case.

### A.    Nature and Circumstances of the Offense

SMITH was both a wholesale and street-level distributor of methamphetamine, who sold methamphetamine as his sole source of income and to support his methamphetamine addiction. Although historically there have not been a large number of methamphetamine prosecutions in

this District, that is no longer the case. After a steady decrease in methamphetamine use over the past decade, use of this potent stimulant has resurfaced in many parts of the country (including Massachusetts) as a serious problem.

Recent reports have confirmed that methamphetamine abuse is increasing dramatically. The Substance Abuse and Mental Health Services Administration ("SAMHSA") has estimated that the number of methamphetamine users rose nationally from 314,000 in 2008 to 569,000 in 2014.[2] In 2016, around 667,000 people aged 12 or older were users of methamphetamine.[3] National data from 2010 to 2015 indicates that almost twice as many individuals regularly used methamphetamine as used heroin.[4] Moreover, fatal overdoses involving methamphetamine more than doubled from 2010 to 2014.[5] And, in 2015, the number of fatal overdoses increased 30 percent over the reported deaths from 2014.[6]

Equally devastating, as methamphetamine production has shifted from makeshift, local labs to sophisticated Mexican laboratories, methamphetamine production and purity have increased exponentially.[7] According to the White House Office of National Drug Control

---

[2] Jon Schuppe, *"Twin Plagues: Meth Rises in Shadow of Opioids,"* NBC News, July 5, 2017, appearing at http://www.nbcnews.com/news/us-news/twin-plagues-meth-rises-shadow-opioids-n776871 (hereinafter, "Jon Schuppe, *Twin Plagues*").

[3] Substance Abuse and Mental Health Services Administration (SAMHSA), *Key Substance Use and Mental Health Indicators in the United States: Results from the 2016 National Survey on Drug Use and Health*, September 2017, appearing at https://www.samhsa.gov/data/sites/default/files/NSDUH-FFR1-2016/NSDUH-FFR1-2016.pdf.

[4] Christine Vestal, "*A New Meth Surge Gathers Momentum,*" Stateline, May 18, 2017, appearing at http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2017/05/18/a-new-meth-surge-gathers-momentum (hereinafter, "Christine Vestal, *A New Meth Surge Gathers Momentum*").

[5] Jon Schuppe, *Twin Plagues.*

[6] Christine Vestal, *A New Meth Surge Gathers Momentum.*

[7] Frances Robles, "*Meth, the Forgotten Killer, is Back. And It's Everywhere*", The New York Times, February 13, 2018, appearing at https://www.nytimes.com/2018/02/13/us/meth-crystal-drug.html (hereinafter, "Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*").

Policy, seizures of methamphetamine have skyrocketed from 7,063 kilograms in 2006 to 44,077 kilograms in 2015.[8]  At the same time, purity of methamphetamine has risen to nearly 100 percent.[9]  As the New York Times has reported, this combination of increased production and increased purity has been particularly lethal:  "There is more meth on the streets today, more people are using it, and more of them are dying."[10]

Methamphetamine abuse varies according to the region.  Although in New England, the substance abuse crisis is most often linked to opioids, methamphetamine cases have spiked in New Hampshire over the past several years.[11]  In 2017, the New Hampshire crime laboratory tested drugs seized in connection with more than 830 methamphetamine-related arrests, compared to just 50 just three years before.[12]  The National Drug Threat Assessment released by the DEA in 2017 explained that drug cartels are actively pursuing new markets on the East Coast to counteract the falling price of meth.[13]  Recent media reports confirm that methamphetamine usage in Massachusetts has been increasing notably.[14]

Even when not lethal, the physical and emotional effects of methamphetamine abuse are dramatic.  Methamphetamine has a horrific impact on its users and on the community.

---

[8] Jon Schuppe, *Twin Plagues*.

[9] *Id.*

[10] Frances Robles, *Meth, the Forgotten Killer, is Back.  And It's Everywhere.*

[11] Paige Sutherland, "*Methamphetamines are back and on the Rise Across New Hampshire*", New Hampshire Public Radio, February 6, 2018, appearing at http://www.nhpr.org/post/methamphetamines-are-back-and-rise-across-new-hampshire#stream/0.

[12] *Id.*

[13] Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere.*

[14] *See* "*Methamphetamine posing new and emerging threat in New England opioid crisis,*" Boston 25 News, Oct. 03, 2019, appearing at https://www.boston25news.com/news/methamphetamine-use-in-area-presenting-new-challenges-for-new-england/992994155/; Felice J. Freyer, *"Meth has taken hold in Massachusetts",* Boston Globe, August 13, 2019, appearing at https://www.bostonglobe.com/metro/2019/08/13/really-last-thing-need-right-now/pj9C3U4JcI9wTgKlxpJOKI/story.html.

Methamphetamine is a tremendously addictive drug, which can cause dramatic physical and emotional changes on those who use it, including increases in aggressive and violent behavior.[15] The physical effects on users are well-documented. The emotional changes are equally devastating:

> Chronic abusers may exhibit symptoms that can include significant anxiety, confusion, insomnia, mood disturbances, and violent behavior. They also may display a number of psychotic features, including paranoia, visual and auditory hallucinations, and delusions (for example, the sensation of insects creeping under the skin). Psychotic symptoms can sometimes last for months or years after a person has quit abusing methamphetamine, and stress has been shown to precipitate spontaneous recurrence of methamphetamine psychosis in formerly psychotic methamphetamine abusers.[16]

### B. Need to Promote Respect for the Rule of Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence

As the above discussion makes clear, there is a compelling need to deter individuals who may be inclined to participate in drug trafficking—particularly substances as dangerous as methamphetamine—for profit. On the other hand, the Government recognizes that the defendant's participation was, in great part, fueled by his own addiction. This, of course, does not excuse the defendant's conduct, which harmed countless others who purchased and used the drugs he distributed. The sentence imposed on the defendant must be balanced to account for his personal circumstances, the need to deter the defendant from additional attempts to distribute narcotics, and to deter others from doing the same.

---

[15] Mark A. R. Kleiman, Jonathan P. Caulkins, and Angela Hawken, <u>Drugs and Drug Policy: What Everyone Needs to Know</u> 120 (Oxford University Press 2011) ("There is . . . a much stronger association between violence and regular methamphetamine use. Heavy use of methamphetamine increases the likelihood of attack behaviors and aggression, with the most compelling evidence coming from laboratory studies involving mice.").

[16] National Institute on Drug Abuse, *What are the long-term effects of methamphetamine abuse,* appearing at https://www.drugabuse.gov/publications/research-reports/methamphetamine/what-are-long-term-effects-methamphetamine-abuse (April 7, 2017).

### C. Defendant's Background

The defendant is a 34-year old high school graduate. PSR ¶ 80. He attended college but did not graduate. *Id.* Prior to this case, the defendant had minimal involvement with the criminal justice system. PSR ¶ 67 (at age 19, OUI resolved via CWOF).

The defendant has dealt with considerable adversity, including the death of his father after a long illness, the suicide of his oldest brother, and a years-long struggle with addiction. PSR ¶¶ 75, 76, 79, 90-95. The defendant's history of drug and alcohol abuse began when he was 12 and grew progressively worse over the years. After the death of his brother in 2006, the defendant apparently abused alcohol, cocaine, and prescription pain medication.

The defendant attended a residential treatment program in 2012 (when he was roughly 26 years old). PSR ¶ 97. The defendant completed a 90-day program and then stayed for approximately two years and worked for the program. *Id.* The defendant's success within the treatment program was, however, short-lived as his drug use skyrocketed after leaving the program. *See* PSR ¶¶ 91-92, 90 (describing SMITH's use of cocaine, crack cocaine, and marijuana). In 2015, the defendant also began using methamphetamine. By 2016, the defendant was using methamphetamine exclusively. PSR ¶ 95. From 2016 until his arrest in 2019, the defendant abused methamphetamine daily (and often multiple times a day). *Id.*

The defendant's work history (or lack thereof) reflects his increasing drug addiction and methamphetamine usage. The defendant was fired from multiple jobs due to drug use. *See* PSR ¶¶ 106-08; *see also* PSR ¶ 96. During the years between 2017 through 2019, the defendant was not gainfully employed; rather, he sustained himself by selling methamphetamine. PSR ¶ 105.

On August 26, 2019, the defendant was arrested on state charges and was detained. Upon being charged federally, the defendant was detained until March 2020. Since his release on March 26, 2020, the defendant has actively participated in substance abuse treatment. Among other things, the defendant successfully completed a structured outpatient addiction program, and he participated in a variety of individual and group therapy programs. PSR ¶ 98. While on release conditions, the defendant suffered from one relapse, but otherwise has done well. *See* PSR ¶ 4.

The defendant also appears to have carried the lessons learned from his participation in the RISE program into his daily life. *See* PSR ¶ 97 (participation in recovery programs through Gavin Foundation); PSR ¶ 102, ECF 75-2 (participating in MyTERN Program); PSR ¶ 104, ECF 75-1 (employed at Walden Local Meat and established food donation program).

D.   **Sentencing of Co-Conspirators**

The defendant is the second member of the conspiracy to be sentenced. On October 28, 2021, Greenberg, the Arizona-based supplier of methamphetamine, was sentenced to 50 months in Phoenix, Arizona. Greenberg had been indicted in the District of Massachusetts; however, his case was transferred for plea and sentencing to the District of Arizona pursuant to Rule 20.

Greenberg's advisory GSR (after a safety-valve adjustment) was 135-168 months. Greenberg's total adjusted offense level (after the safety-valve adjustment) was 31 – two levels higher than SMITH.[17] Like SMITH, Greenberg was addicted to methamphetamine and had been supporting himself via the sale of methamphetamine. Similarly, like SMITH, Greenberg had

---

[17] Unlike SMITH, Greenberg had a CHC of III, whereas SMITH has a CHC of I. Greenberg's prior sentences were all for offenses directly attributable to his continuing addiction to methamphetamine (*e.g.,* shoplifting, possession of drug paraphernalia).

successfully participated in drug treatment programs and appeared to have turned his life around while on pretrial release.

At Greenberg's sentencing, the Government requested that the court impose a sentence of not more than 135 months. After taking into consideration all of Greenberg's personal characteristics, the court varied downward dramatically from the applicable GSR and imposed a sentence of 50 months.

## V.     CONCLUSION

In many respects, the defendant's sentencing presents a tale of two different individuals: one (the defendant pre-arrest) who distributed a significant quantity of methamphetamine over a prolonged period, thus significantly harming the community; the second (the defendant post-arrest) who has made significant efforts in trying to correct his own life path and improve his surrounding community. Imposition of sentence in this case thus requires a careful balancing of countervailing factors, taking into account the various § 3553(a) factors.

As stated previously, in light of SMITH's extraordinary participation in the RISE program, the Government recommends a 36-month reduction in the advisory GSR, thus resulting in a revised GSR of 51-72 months. The Government further submits that an additional modest downward variance is warranted both to achieve proportionality in sentencing and to acknowledge SMITH's continuing efforts in battling his addiction and in giving back to the community (outside of the RISE program). At the same time, the Government submits that a period of incarceration remains necessary given the severity and prolonged nature of SMITH's drug trafficking.

Accordingly, and consistent with the various factors set forth in 18 U.S.C. § 3553(a), the Government respectfully recommends that the Court impose a sentence in the range of 36 to 42 months in prison and a term of supervised release of three years. Payment of a $200 special assessment is also required.

Respectfully submitted,

JOSHUA S. LEVY
First Assistant United States Attorney

By:    */s/ James E. Arnold*
JAMES E. ARNOLD
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3603

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ James E. Arnold*
JAMES E. ARNOLD

Date: February 15, 2022.